William NORFLEET and David Lane,
Plaintiffs-Appellants,

v.

ISTHMIAN LINES, INC., Defendant-
Appellee.

ISTHMIAN LINES, INC., Defendant and
Third-Party Plaintiff,

v.

WHITEHALL TERMINAL CORPORA-
TION, Third-Party Defendant.

Nos. 7–8, Dockets 29433 and 29434.

United States Court of Appeals
Second Circuit.

Argued Oct. 22, 1965.

Decided Jan. 6, 1966.

Richard L. Fisch, New York City (Fisch & Kaplan, New York City, on the brief), for appellants.

Daniel J. Dougherty, New York City (Kirlin, Campbell & Keating, New York City, on the brief; Robert C. Mirone, New York City, of counsel), for appellees.

Before WATERMAN and MOORE, Circuit Judges, and TYLER, District Judge.

TYLER, District Judge.

William Norfleet and David Lane appeal from an adverse judgment in the United States District Court for the Southern District of New York after the jury returned a verdict in favor of the Isthmian Lines, Inc. Because of certain erroneous and confusing instructions given by the trial judge at the instance of counsel for the appellee, we reverse and remand for a new trial.

On December 16, 1958, appellants, longshoremen employed by the Whitehall Terminal Corporation in Norfolk, Virginia, were working aboard the vessel S.S. Steel Apprentice owned by the appellee. On the day in question the vessel was berthed at Pier 1, Army Base, in Norfolk. That morning while the appellants were working in the No. 5 hatch 'tween deck area, a padeye or collar attached to the jumbo boom of the S.S. Steel Apprentice broke, and as a result the rigging on the jumbo boom and part of the fractured padeye fell into the 'tween deck area of No. 5 hatch. Appellants testified that some portion of this rigging or the padeye struck them and caused them to sustain personal injuries for which they seek to recoup damages.

Originally, appellants had asserted claims of unseaworthiness of the vessel and negligence on the part of the agents of the vessel. During the course of the trial, however, appellants through their counsel withdrew their claim of negligence. Thus, the case was submitted to the jury at the close of the evidence only upon the theory of breach of warranty of seaworthiness.

On this appeal, appellants raise a number of arguments to the effect that the trial judge erred in issuing instructions based upon rules of negligence and in failing to properly answer a request by the jury, after it had retired for deliberations, for specific instruction on certain principles of law. Appellants also urge here that the verdict was against the weight of the evidence; more particularly, they assert that a metallurgist called by the appellee gave evidence which can only be construed as standing for the proposition that the padeye in question was not reasonably fit for its obvious intended purpose and thus was unseaworthy.

Although we do not accept appellants' contentions with respect to errors in the charge precisely as stated in their briefs and oral arguments, we do agree for reasons to be indicated hereinafter that particularly a supplemental instruction issued by the trial judge at the instance of the appellee without doubt caused confusion in the jury's mind and effectively misstated controlling law which was relevant to the jury's deliberations.

To put our reasoning in perspective, it is necessary to state certain additional facts which were brought to light during the trial. From the evidence, the jury

could have found that on the morning of December 16, 1958 the longshoremen employed by the stevedore commenced work at or shortly after 0800 with the loading of nine ton Army trucks. Prior to the accident which took place sometime between 1030 and 1100 hours, several of these trucks had already been loaded by means of the jumbo boom heretofore mentioned. This boom was a thirty ton jumbo or heavy-lift boom based upon and pivoting from a position on the deck at the center line of the vessel. It functioned, of course, to swing out over the pier to pick up cargo and then to swing cargo in position over the hatch. The boom was activated or moved in the desired direction by working lines or guides moved by inshore and offshore winches. It was appellants' contention at trial that for five or ten minutes prior to the alleged accident the jumbo boom had not been moved or put in operation. More particularly, they contended that the boom was in place over No. 5 hatch when suddenly the collar or padeye at the peak or head of the boom broke with the resulting fall of the rigging on the boom. But there was other testimony in the case from which the jury could have found that the activating winches attached to the boom were in operation and that the offshore winchman failed to "slack off" as the inshore winchman was hauling, thereby creating a "tight-lining" with resultant extreme pressure on the boom padeye and causing or contributing to the breaking of the padeye.

■ Turning first to the supplemental instruction most heavily attacked by appellants, it seems clear that substantial error was committed by the trial judge when, just after his principal charge was completed and at the insistence of defense counsel, he informed the jury:

"If you find that the steamship company did not supervise or control the longshoremen, rather that the work was conducted solely by the longshoremen themselves, you must find that the defendant did not violate its duty to provide the longshoremen with a safe place to work unless a defect was patent."

This instruction, in effect, amounted to a resurrection of the now extinct doctrine of "relinquishment of control." Admittedly, the "relinquishment of control doctrine" was at one time applicable as a defense by steamship companies who were sued by longshoremen for breach of the warranty of seaworthiness. E. g., Mollica v. Compania Sud-Americana de Vapores, 202 F.2d 25 (2 Cir. 1953); Lynch v. United States, 163 F.2d 97 (2 Cir. 1947); Lauro v. United States, 162 F.2d 32 (2 Cir. 1947); Grasso v. Lorentzen, 149 F.2d 127 (2 Cir. 1945). This, however, is no longer so.

■ The basis of the former doctrine of relinquishment of control was that the liability of a shipowner to a longshoreman was essentially a question of negligence, i. e., that the shipowner had satisfied his duty to provide a seaworthy ship if he had made a diligent inspection. Grasso v. Lorentzen, 149 F.2d 127 (2 Cir. 1945). Since the decision in Seas Shipping Co. v. Sieracki, 328 U.S. 85, 66 S.Ct. 872, 90 L.Ed. 1099 (1946), however, the longshoreman has been accorded the same protections as a seaman. Crumady v. The Joachim Hendrik Fisser, 358 U.S. 423, 79 S.Ct. 445, 3 L.Ed.2d 413 (1959); Mitchell v. Trawler Racer, Inc., 362 U.S. 539, 80 S.Ct. 926, 4 L.Ed.2d 941 (1960); Alaska S.S. Co. v. Petterson, 347 U.S. 396, 74 S.Ct. 601, 98 L.Ed. 798 (1954). And the liability of the shipowner to the seaman for injuries resulting from unseaworthiness does not depend on negligence. It is absolute and non-delegable. See Mahnich v. Southern S.S. Co., 321 U.S. 96, 64 S.Ct. 455, 88 L.Ed. 561 (1944); Seas Shipping Co. v. Sieracki, 328 U.S. 85, 66 S.Ct. 872 (1946); Alaska S.S. Co. v. Petterson, 347 U.S. 396, 74 S.Ct. 601 (1954). Consequently, the same standard—an absolute duty without regard to negligence—is owed to a longshoreman by the steamship company in an action for breach of the warranty of seaworthiness. This court held in Grillea v. United States, 232 F.2d 919 (2 Cir. 1956), that long-

shoremen themselves could render a ship *pro tanto* unseaworthy and make the vessel owner liable for injuries to one of them. See also, Rogers v. United States Lines, 347 U.S. 984, 74 S.Ct. 849, 98 L.Ed. 1120 (1954); Alaska S.S. Co. v. Petterson, supra; Crumady v. The Joachim Hendrik Fisser, supra.

In Alaska Steamship Co. v. Petterson, 347 U.S. 396, 74 S.Ct. 601 (1954), the Supreme Court affirmed a judgment holding the shipowner liable for injuries caused by defective equipment temporarily brought on board by an independent contractor over which the owner had no control. That decision, thus, is specific authority for the proposition that the shipowner's actual or constructive knowledge of the unseaworthy condition is not essential to his liability.

The trend in maritime law, which is to increase the rights of maritime workers and not to limit them, was recently illustrated in Mitchell v. Trawler Racer, Inc., 362 U.S. 539, 80 S.Ct. 926 (1960). In *Mitchell,* the Court held that a "transitory" unseaworthy condition, one which is temporary rather than permanent in nature, comes within the scope of the unseaworthiness doctrine, even though the owner had no notice of its existence. Under prior law, notice was necessary for liability under the circumstances present in *Mitchell.* See, e. g., Cookingham v. United States, 184 F.2d 213 (3 Cir. 1950).

■ Whether a defect which results in an unseaworthy condition is patent or latent does not alter the liability of a shipowner to provide a seaworthy vessel. Boudoin v. Lykes Brothers Steamship Co., 348 U.S. 336, 75 S.Ct. 382, 99 L.Ed. 354 (1955); Seas Shipping Co. v. Sieracki, 328 U.S. 85, 66 S.Ct. 872 (1946); Alaska Steamship Co., Inc. v. Petterson, 347 U.S. 396, 74 S.Ct. 601 (1954). Where the failure of a furnished appurtenance, aboard ship, is dramatically obvious, as for example where a piece of equipment breaks,[1] the inference of unseaworthiness is quite strong. It would appear from a reading of the cases that the mere fact that the failure occurs is sufficient evidence to support a finding of unseaworthiness. See, e. g., Michalic v. Cleveland Tankers, Inc., 364 U.S. 325, 81 S.Ct. 6, 5 L.Ed.2d 20 (1960); Thorson v. Inland Navigation Co., 270 F.2d 432, 77 A.L.R.2d 825 (9 Cir. 1959). Even if the appurtenance fails because of a latent defect, however, the owner cannot be absolved, since absence of personal fault is not a relevant consideration. Boudoin v. Lykes Brothers Steamship Co., supra; Seas Shipping Co. v. Sieracki, supra.

Therefore, since the law with respect to the duty owed by a steamship company to a longshoreman working aboard a vessel owned by the steamship company is that the steamship company has an absolute and non-delegable duty to provide a seaworthy vessel and because those protected by this duty include longshoremen, the trial judge committed reversible error when he rendered the aforementioned supplemental charge.

■ Even if one were to assume *arguendo* that the trial judge had correctly stated the rules of the warranty of seaworthiness in other portions of his charge, the erroneous supplemental charge came just before the jury retired to begin its deliberations and thus constituted a "critical portion" of the instructions. See DeLima v. Trinidad Corp., 302 F.2d 585 (2 Cir. 1962). Moreover, in the context of the closely disputed issue as to how the padeye came away, this was a crucial instruction; "[i]f it is a specific ruling on a vital issue and misleading, the error is not cured by a prior unexceptional and unilluminating abstract charge." Bollenbach v. United States, 326 U.S. 607, 612, 66 S.Ct. 402, 405, 90 L.Ed. 350 (1946).

■ The appellate function of this court is to satisfy itself that instructions, taken as a whole and viewed in light of

---

1. See, e. g., Seas Shipping Co. v. Sieracki, supra; Mahnich v. Southern S.S. Co., supra; Green v. Orion Shipping and Trading Co., 139 F.Supp. 431 (D.Md. 1956).

the evidence, show no tendency to confuse or mislead the jury as to principles of law which are applicable. Oliveras v. The United States Lines Co., 318 F.2d 890 (2 Cir. 1963). There is very little doubt that the jury in this case was confused by the supplemental charge given before they began to deliberate.

Upon taking up its deliberations after lunch, the jury sent in a note containing two questions, the second of which read, "Does mishandling of gear immediately prior to accident constitute unseaworthiness?"

By the latter question the trial judge was presented with an opportunity to rectify the confusing and erroneous impression left by his supplemental charge. His answer to this question, however, was, "As far as that is concerned, all I can say is based upon the evidence you have heard and the charge that I gave the jury before you retired, I think you should be able to resolve that problem. It is up to you." In short, the jury was left to flounder upon a crucial issue in the case after the last instructions given on the point were clearly erroneous.[2]

It is the duty of the court to instruct the jury as to the law. Herron v. Southern Pacific Co., 283 U.S. 91, 51 S.Ct. 383, 75 L.Ed. 857 (1931); Muldrow v. Daly, 117 U.S.App.D.C. 318, 329 F.2d 886 (1964); Hanover Fire Ins. Co. v. Sides, 320 F.2d 437 (5 Cir. 1963). The Supreme Court in Herron v. Southern Pacific Co., 283 U.S. 91, 95, 51 S.Ct. 383, 384 (1931) said, "In a trial by jury in a federal court, the judge is not a mere moderator, but is the governor of the trial for the purpose of assuring its proper conduct and of determining questions of law."

The question asked by the jury in our opinion called for a further explanation of the law relating to unseaworthiness.

As the issues were submitted to the jury, Isthmian could only be found liable if the injuries resulted from an unseaworthy condition. Most courts agree, however, in holding that where injury is caused solely by the negligent use of reasonably fit equipment there is no liability under the doctrine of unseaworthiness. Oblatore v. United States, 289 F.2d 400 (2 Cir. 1961); Manhat v. United States, 220 F.2d 143 (2 Cir. 1955); Berti v. Compagnie de Navigation Cyprien Fabre, 213 F.2d 397 (2 Cir. 1954). In Grillea v. United States, 232 F.2d 919 (2 Cir. 1956) the court found that a hatch cover had been in the wrong place for a time long enough to cause it to be an unseaworthy condition. In Billeci v. United States, 298 F.2d 703 (9 Cir. 1961), however, where the appellant was injured by a winch which slipped out of gear because the appellant's fellow longshoremen had failed to use a necessary safety device, recovery against the shipowner was denied by the Ninth Circuit because "the shipowner's warranty of seaworthiness does not extend to a negligent use by longshoremen of seaworthy appliances."[3] Grillea was distinguished on the ground that there the negligent act had terminated and had created a condition. It would seem, thus, that in order to recover a longshoreman must show that an "unseaworthy condition" was in existence at the time the injury was sustained. The fact that the unseaworthy condition was created by the negligence of a fellow longshoreman does not absolve the shipowner from liability if it is shown that the "active negligence" had come to rest and the resulting "condition" was in existence.

The jury should have been informed that even if an unseaworthy condition had been created by a negligent act of a fellow longshoreman, the ship-

---

2. Indeed, it can be argued that this was the only instruction going to this critical point upon the facts of the case. Nowhere in his principal remarks, except for general remarks that a shipowner owes a non-delegable duty to maintain a seaworthy ship, did the trial judge instruct the jury that an unseaworthy condition might be created by the negligence of appellants' fellow workers.

3. Billeci v. United States, supra, at 705–706.

owner may still be liable. Grillea v. United States, 232 F.2d 919 (2 Cir. 1956); Rich v. Ellerman & Bucknall S.S. Co., 278 F.2d 704 (2 Cir. 1956). At the same time the judge might properly have instructed the jury further that if the injury resulted from negligent mishandling of a seaworthy appurtenance and if the injury occurred before any unseaworthy condition resulted, then the shipowner would not be liable in an action based on breach of the warranty of seaworthiness. Spinelli v. Isthmian S.S. Co., 326 F.2d 870 (2 Cir. 1964); Puddu v. Royal Netherlands Steamship Company, 303 F.2d 752 (2 Cir. 1962); Rawson v. Calmar S.S. Corp., 304 F.2d 202 (9 Cir. 1962). Refusal to specifically answer the jury's eminently understandable question compounded the error already created by the erroneous supplemental charge, and a new trial therefore is necessary.

In view of this conclusion, it is unnecessary for us to consider and pass upon appellants' other assignments of error. Reversed and remanded.